UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

GUSTAVO ADOLFO UMANZOR-
TREJO,

              Petitioner,

                                          Case No.: 2:26-cv-11258

v.                                   Hon. Gershwin A. Drain

MARKWAYNE MULLIN, *Secretary of U.S.*
*Department of Homeland Security,* TODD
BLANCHE, *U.S. Attorney General*, TODD
LYONS, *Acting Director of U.S. Immigration
and Customs Enforcement*, ROBERT
LYNCH, *Director of U.S. Immigration and
Customs Enforcement, Detroit Field Office*,
and JOHN DOE, *Warden*,

              Respondents.

_____/

**OPINION AND ORDER GRANTING RESPONDENTS' MOTION TO
DISSOLVE TRO [ECF No. 10], CONVERTING PETITIONER'S MOTION
FOR TRO INTO MOTION FOR PRELIMINARY INJUNCTION, AND
GRANTING PRELIMINARY INJUNCTION**

## I.      INTRODUCTION

Plaintiff Gustavo Adolfo Umanzor-Trejo is a Honduran citizen who was

mandatorily detained under 8 U.S.C. § 1225(b)(2) in Monroe County Jail pending

his removal from the United States. He filed a Petition for Writ of Habeas Corpus,

1

arguing that his mandatory detention under § 1225(b)(2) is unlawful and unconstitutional, and that he should be given a bond hearing under § 1226(a) instead. Petitioner also filed a motion for temporary restraining order ("TRO"), seeking his immediate release and a bond hearing upon re-detention, which the Court granted. The Court then ordered Respondents to show cause why a preliminary injunction should not be entered. Respondents filed a motion to dissolve the TRO, arguing that it was procedurally and substantively improper.

The Court held a hearing on the motion to dissolve the TRO and preliminary injunction on May 5, 2026. Concluding that the TRO is procedurally improper, the Court VACATES and DISSOLVES the TRO. However, concluding that the merits of preliminary injunctive relief are sound, the Court converts Petitioner's Motion for TRO into a Motion for Preliminary Injunction and GRANTS preliminary injunctive relief as further described herein. The Court further ORDERS briefing on whether it retains jurisdiction in this matter.

## I.   BACKGROUND

Petitioner Gustavo Adolfo Umanzor-Trejo is a 36-year-old citizen of Honduras. ECF No. 1, PageID.4. In March 2020, he unlawfully entered the United States and was charged with removal for not having a valid entry document permitting him to enter the United States under 8 U.S.C. § 1182(a)(7). ECF No. 1-1, PageID.29. Petitioner filed applications for asylum, withholding of removal, and

protection under the Convention Against Torture, which remain pending to this day. ECF No. 1, PageID.4–5.

On January 27, 2026, Border Patrol Agents in Tampa, Florida arrested Petitioner for being illegally present in the country when they encountered him during a traffic stop. ECF No. 9-4, PageID.162. Petitioner was subsequently transferred to the Monroe County Jail in Monroe, Michigan, where he was confined under 8 U.S.C. § 1225(b)(2)—which provides for mandatory detention during removal proceedings. ECF No. 1, PageID.5. On March 12, 2026, Petitioner sought a custody redetermination in the Detroit Immigration Court, arguing that he was entitled to a bond hearing under § 1226(a), and that he was not a flight risk or danger to the community. *Id.* The Immigration Judge denied the request, finding it was unable to grant the relief Petitioner sought under *Matter of Yajure Hurtado*, 29 I. & N. Dec. 216 (Sept. 5, 2025). *Id.*

Petitioner is one of thousands of noncitizens whose detention without bond is a direct result of a recent Department of Homeland Security ("DHS") policy change. In July 2025, DHS issued an internal memorandum entitled "Interim Guidance Regarding Detention Authority for Applications for Admission." *See Blanco Cabrera v. Raycraft*, No. 4:26-CV-00085-DAR, 2026 WL 904606, at *1 (N.D. Ohio Apr. 2, 2026). This new policy "subjects noncitizens who have resided in the United States for a long time and who are apprehended in the interior of the country to

mandatory detention" under 8 U.S.C. § 1225(b)(2), instead of discretionary detention under 8 U.S.C. § 1226(a). *See Moreno-Espinoza v. Ladwig*, No. 2:25-cv-03093-TLP-tmp, 2025 WL 3691452, at *1 (W.D. Tenn. Dec. 19, 2025). It revises DHS's "decades-long interpretation" that most noncitizens already present in the United States were eligible for release on bond during removal proceedings under § 1226(a).[1] *See Kaur v. Raycraft*, No. 4:25-CV-02679, 2026 WL 709728, at *2 (N.D. Ohio Mar. 13, 2026).

The Board of Immigration Appeals ("BIA") issued its decision in *Matter of Yajure Hurtado* on September 5, 2025, which agreed with DHS's new interpretation of § 1226(a) and § 1225(b)(2). *Matter of Yajure Hurtado*, 29 I. & N. Dec. 216 (Sept. 5, 2025). As such, "immigration judges are now bound by precedent which denies noncitizens bond hearings under § 1225(b)(2)(A)[.]" *Moreno-Espinoza*, 2025 WL 3691452, at *2. Consequently, the federal courts have been subject to "a deluge of habeas actions" from detainees in ICE custody who argue that their detention without bond is legally erroneous and unconstitutional. *Garcia Ortiz v. Henkey*, No. 1:26-cv-00043-BLW, 2026 WL 948275, at *1 (D. Idaho Apr. 7, 2026).

---

[1] The discretionary detention scheme in § 1226(a) is subject to an exception for noncitizens present in the country with certain criminal histories. *See* § 1226(c)(1). Under this exception, noncitizens with the requisite criminal histories are subject to mandatory detention without bond.

Petitioner filed a Petition for Habeas Corpus, arguing that his detention without bond under § 1225(b)(2) violates the Immigration and Nationality Act ("INA"), due process under the Fifth Amendment, violation of the Administrative Procedure Act, violation of equal protection under the Fifth Amendment, violation of the Suspension Clause, and violation of the *Accardi* doctrine with respect to 8 C.F.R. § 287.8(C)(2)(I) and (II). *See* ECF No. 1.

Petitioner also filed a motion for TRO, seeking his release and a bond hearing based only on violation of the INA and violation of due process. *See* ECF No. 2, ECF No. 2-1. The Court granted the TRO, ordering that Petitioner be released and, if re-detained, given a bond hearing; setting a hearing for May 5, 2026 to determine whether the TRO should be converted into a preliminary injunction; and ordering Respondents to show cause why a preliminary injunction should not issue. *See* ECF No. 4. Respondents filed a motion to dissolve the TRO, arguing that the TRO failed to comply with the procedural requirements of Rule 65(b) and that preliminary injunctive relief is inappropriate. ECF No. 10. Respondents also substantively responded to the Court's order to show cause, arguing that a preliminary injunction should not issue because Petitioner's detention is legally and constitutionally sound. ECF No. 11.

The Court held a hearing on the issue of the TRO and preliminary injunction on May 5, 2026. At the hearing, the parties notified the Court for the first time that

after his release, Petitioner went back to his home in Florida. Respondents argue that Petitioner's move divests the Court of jurisdiction in this matter, while Petitioner argues it does not.

## II.    LEGAL STANDARD

Under Federal Rule of Civil Procedure 65(a), a court may issue a preliminary injunction. Fed. R. Civ. P. 65. A preliminary injunction is an "extraordinary and drastic" remedy that is "never awarded as of right." *O'Toole v. O'Connor*, 802 F.3d 783, 788 (6th Cir. 2015). In evaluating a request for a preliminary injunction, a court should consider: (1) the movant's likelihood of success on the merits; (2) whether the movant will suffer irreparable injury without a preliminary injunction; (3) whether the balance of equities tips in his favor; and (4) whether the injunction is in the public interest. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)). When the Government is an opposing party to a preliminary injunction, the third and fourth factors "merge." *Nken v. Holder*, 556 U.S. 418, 435 (2009). "[T]he four considerations applicable to preliminary injunctions are factors to be balanced and not prerequisites that must be satisfied." *In re Eagle-Picher Indus., Inc.*, 963 F.2d 855, 859 (6th Cir. 1992). The party seeking the preliminary injunction has the burden of demonstrating the justification for injunctive relief. *Granny Goose Foods, Inc. v. Bhd. of Teamsters and Auto Truck Drivers Loc. No. 70 of Alameda Cnty.*, 415 U.S. 423, 441 (1974).

The standard governing preliminary injunctions is the same for TROs. *See Am. Civil Liberties Union of Mich. v. Does 1–6*, 755 F. Supp. 3d 1003, 1007 (E.D. Mich. 2024). A TRO is a preliminary injunction entered without notice, and is only justified if the following procedural requirements are met:

> (A) specific facts in an affidavit or a verified complaint clearly show that immediate and irreparable injury, loss, or damage will result to the movant before the adverse party can be heard in opposition; and
> (B) the movant's attorney certifies in writing any efforts made to give notice and the reasons why it should not be required.

### III.   DISCUSSION

#### A. Motion to Dissolve TRO

Respondents offer several arguments as to why the TRO should be dissolved. First, Respondents argue that Petitioner's motion was not supported by verification or affidavit. ECF No. 10, PageID.174. Second, Respondents argue that Petitioner's motion failed to adequately describe his efforts to notify Respondents. *Id.* Respondents also argue that the injunctive relief improperly disrupts the status quo instead of maintaining it and there are no special circumstances warranting preliminary injunctive relief in habeas cases such as this. *Id.* at PageID.173, 175.

In Petitioner's response, he states that his legal assistant contacted the U.S. Attorney's Office in the Eastern District of Michigan on April 16, 2026 regarding how to serve the TRO on Respondents, and thereby notified them of the TRO. In any event, Respondents received the TRO in the mail prior to the Court issuing its

order on the TRO. ECF No. 13, PageID.202. Petitioner also argues that the status quo is, in fact, preserved by preliminary injunctive relief. *Id.* at PageID.203. Finally, Petitioner asserts that if there are any procedural errors in the TRO, the TRO may harmlessly be converted into a preliminary injunction now that both parties have had the opportunity to be heard on the issues. *Id.*

The Court agrees with Respondents that the TRO was issued with procedural errors. First, although Petitioner attempted to file a verified petition and a verified motion, his "verifications" did not specifically state that the documents were filed *under penalty of perjury*. *See* ECF No. 1, PageID.27; ECF No. 2, PageID.92. After additional review of the relevant law, the Court concludes that such verification is ineffectual under 28 U.S.C. § 1746. *See Milczak v. Gen. Motors, LLC*, 102 F.4th 772, 781 (6th Cir. 2024) (stating that under § 1746, a verification must "at the very least… swear under penalty of perjury[.]"). Second, although Petitioner included evidence of the tracking number for the motion—i.e., demonstrating his efforts at notice— and described Petitioner's irreparable injury due to unlawful detention, he did not separately certify *in his own writing* what efforts were taken to notify Respondents of the motion or specifically list the reasons why notice should not be required. *See Gen. Motors Corp. v. Buha*, 623 F.2d 455, 457–58 (6th Cir. 1980). Petitioner's post-hoc attempt to do so now does not cure that initial failure. For these reasons, the TRO must be dissolved as improvidently issued.

However, the Court rejects Respondents' other arguments that preliminary injunctive relief is categorically inappropriate under the circumstances. First, Respondents argue that Petitioner's request for an injunction "does not maintain the status quo but instead improperly grants him the final relief he seeks in this case." ECF No. 11, PageID.186; *see also* ECF No. 10, PageID.173. It is true that "[t]he purpose of a preliminary injunction is to preserve the status quo until a trial on the merits." *S. Glazer's Distribs. of Ohio, LLC v. Great Lakes Brewing Co.*, 860 F.3d 844, 848 (6th Cir. 2017).

But Respondents mistake what the "status quo" is in this case. For purposes of a preliminary injunction, the "status quo" is the "last, *uncontested* status preceding commencement of the controversy[.]" *Blaylock v. Cheker Oil Co.*, 547 F.2d 962, 965 (6th Cir. 1976) (emphasis added); *Corning Glass Works v. Lady Cornella Inc.*, 305 F. Supp. 1229, 1231 (E.D. Mich. 1969) ("[T]he status quo is the last uncontested status which preceded the impending controversy."); *Maldonado Vazquez v. Feeley*, 805 F. Supp. 3d 1112, 1150 (D. Nev. 2025) ("The *status quo* thus precedes DHS' July 8, 2025 change in policy—in other words, the *status quo* is that § 1226(a) applies to Petitioner and noncitizens similarly situated. As such, the burden on the Government here is minimal because the preliminary injunction simply preserves the *status quo*."); *Valencia Zapata v. Kaiser*, No. 25-cv-07492-RFL, 2025 WL 2578207, at *4 (N.D. Cal. Sept. 5, 2025) (finding that releasing noncitizens from

9

custody was necessary to *return* them to the status quo). The Court is persuaded by these authorities that the status quo in this case is *before* Petitioner's detention under § 1225(b)(2).

In fact, courts across the country have granted preliminary injunctions for noncitizen petitioners when presented with the same legal issues under the same circumstances. *See Valencia Zapata v. Kaiser*, 801 F. Supp. 3d 919, 941–42 (N.D. Cal. 2025); *Maldonado v. Olson*, 795 F. Supp. 3d 1134, 1155–56 (D. Minn 2025); *Rodriguez v. Bostock*, 779 F. Supp. 3d 1239, 1245 (W.D. Wash. 2025); *Guerrero Orellana v. Moniz*, 802 F. Supp. 3d 297, 313–14 (D. Mass 2025); *Alvarez Ortiz v. Freden*, 808 F. Supp. 3d 579, 601 (W.D.N.Y. 2025); *J.A.C.P. v. Wofford*, No. 1:25-cv-01354-KES-SKO (HC), 2025 WL 3013328, at *8–*9 (E.D. Cal. Oct. 27, 2025); *Beltran v. Bondi*, No. 1:25-cv-258, 2025 WL 4592302, at *9 (D.N.D. Dec. 5, 2025).

Furthermore, many courts have issued the same preliminary injunctive relief that the Court ordered here, i.e., *immediate* release subject to a bond hearing if re-detained. *See Rodriguez-Acurio v. Almodovar*, 811 F. Supp. 3d 274, 319–20 (E.D.N.Y. 2025) (explaining that simply ordering a bond hearing provides no real relief because the petitioner had already been detained for months in violation of her due process rights without adequate procedures, and requiring the petitioner to be released and only re-detained if given a bond hearing); *Valencia Zapata*, 801 F. Supp. 3d at 942 (ordering immediate release and requiring a bond hearing if the petitioner

10

were re-detained); *Crispin M.C. v. Noem*, No. 1:25-cv-01487-KES-HBK (HC), 2026 WL 70553, at *8 (E.D. Cal. Jan. 8, 2026) (same); *J.A.C.P.*, 2025 WL 3013328, at *8 (same); *see also Alejandro v. Olson*, --- F. Supp. 3d ---, No. 1:25-cv-02027-JPH-MKK, 2025 WL 2896348, at *9 (S.D. Ind. 2025) (simply ordering immediate release because respondents did not assert that there was any basis for petitioner's detention under 8 U.S.C. § 1226(a)).

Second, Respondents argue that a preliminary injunction improperly grants Petitioner the final relief he seeks. This assertion is incorrect. While an injunction maintains the status quo by ordering a bond hearing or release, Petitioner's case has not been resolved and Respondents could re-detain Petitioner without an opportunity for bond again if the Court finds in favor of Respondents on the merits. *See Nielsen v. Preap*, 586 U.S. 392, 406 (2019) ("Unless that preliminary injunction was made permanent and was not disturbed on appeal, these individuals faced the threat or re-arrest and mandatory detention."); *Carlos v. Noem*, No. 2:25-cv-01900-RFB-EJY, 2025 WL 2998184, at *4 (D. Nev. Oct. 24, 2025) ("Where—as here—the government complies with a district court order that results in release from detention, that does not render a case moot. Instead, the government is free to appeal that order, and a party who received only temporary relief may continue to seek final relief."). An order on a preliminary injunction does not resolve the merits of Petitioner's habeas case and is not the final relief he seeks.

11

In *General Motors v. Buha*, the Sixth Circuit noted that the district court had erroneously granted a motion for TRO that had failed to comply with Rule 65(b)'s procedural requirements. But the Court further noted that the TRO was superseded by a preliminary injunction following notice and hearing, which resulted in no prejudice to the opposing party and, therefore, harmless error. 623 F.2d at 457–58. Here, Respondents have briefed the issue of a preliminary injunction and have been given a hearing on the matter. After Respondents' full opportunity to be heard, the Court concludes that a preliminary injunction is warranted for the reasons explained below, and grants preliminary injunctive relief as described in the conclusion of this Order.

## B. Likelihood of Success on the Merits

The first preliminary injunction factor to be considered is Petitioner's likelihood of success on the merits of his INA claim and due process claim. Petitioner argues that his mandatory detention under § 1225(b)(2) is unlawful because his detention *should* fall under § 1226(a), which provides for a bond determination. Petitioner also argues that his detention violates his due process rights under *Mathews v. Eldridge*.

### a. INA Claim

#### i. *Statutory Framework*

"Two statutes principally govern the detention of noncitizens pending removal proceedings: 8 U.S.C. §§ 1225 and 1226." *Gomes v. Hyde*, 804 F. Supp. 3d 265, 268–69 (D. Mass. 2025). To begin, 8 U.S.C. § 1226(a) provides "a discretionary detention framework," *see Lopez-Campos v. Raycraft*, 797 F. Supp. 3d 771, 777 (E.D. Mich. 2025), for "aliens already present in the United States." *Jennings v. Rodriguez*, 583 U.S. 281, 303 (2018). That section permits the arrest and detention of a noncitizen pending a decision on whether the noncitizen is to be removed from the United States, but provides that the noncitizen may be released on bond of at least $1,500 or on conditional parole during those proceedings. 8 U.S.C. § 1226(a)(2). This "is considered the 'usual removal process.'" *Chogllo Chafla v. Scott*, 804 F. Supp. 3d 247, 256 (D. Me. 2025) (citing *Dep't of Homeland Sec. v. Thuraissigiam*, 591 U.S. 103, 108 (2020)). "The only exception to section 1226's discretionary detention regime is that the Attorney General 'shall take into custody' any noncitizen involved in certain enumerated criminal activities." *Id.* (citing 8 U.S.C. § 1226(c)(1)).[2]

---

[2] A noncitizen falls into this exception—and is subject to mandatory detention—if he:

> (A) is inadmissible by reason of having committed any offense covered in section 1182(a)(2) of this title,
> (B) is deportable by reason of having committed any offense covered in section 1227(a)(2)(A)(ii), (A)(iii), (B), (C), or (D) of this title,
> (C) is deportable under section 1227(a)(2)(A)(i) of this title on the basis of an offense for which the alien has been sentence[d] to a term of imprisonment of at least 1 year,

On the other hand, "[s]ection 1225(b) 'supplement[s] § 1226's detention scheme.'" *Rodriguez*, 779 F. Supp. 3d at 1246 (quoting *Rodriguez Diaz v. Garland*, 53 F.4th 1189, 1197 (9th Cir. 2022)). It applies to noncitizens "seeking admission into the country[.]"*Jennings*, 583 U.S. at 289. Under "8 U.S.C. § 1225, an alien who 'arrives in the United States,' or 'is present' in this country but 'has not been admitted,' is treated as 'an applicant for admission.'" *Jennings*, 583 U.S. at 287 (citing 8 U.S.C. § 1225(a)(1)). These noncitizens "fall into one of two categories, those covered by § 1225(b)(1) and those covered by § 1225(b)(2)." *Id.* "Section 1225(b)(1) concerns the inspection of noncitizens arriving in the United States and certain other noncitizens who have not been admitted or paroled." *Rodriguez*, 779 F. Supp. 3d at 1247 (cleaned up). Such noncitizens are "normally ordered removed 'without further hearing or review' pursuant to an expedited removal process[.]" *Id.* (quoting *Jennings*, 583 U.S. at 287). Section 1225(b)(2) involves the inspection of "other" noncitizens who are applicants for admission and "seeking admission." *See*

---

(D) is inadmissible under section 1182(a)(3)(B) of this title or deportable under section 1227(a)(4)(B) of this title, or
(E)(i) is inadmissible under paragraph (6)(A), (6)(C), or (7) of section 1182(a) of this title; and
(ii) is charged with, is arrested for, is convicted of, admits having committed, or admits committing acts which constitute the essential elements of any burglary, theft, larceny, shoplifting, or assault of a law enforcement officer offense, or any crime that results in death or serious bodily injury to another person[.]

8 U.S.C. § 1226(c)(1).

8 U.S.C. § 1225(b)(2). "Individuals detained under § 1225 are not entitled to a bond hearing," and other than limited exceptions not implicated here, "detention… is considered mandatory." *Lopez Benitez v. Francis*, 795 F. Supp. 3d 475, 484 (S.D.N.Y. 2025).

### ii.     Interpretation of Plain Text of § 1225(b)(2)

According to Respondents, Petitioner is properly detained without bond under § 1225(b)(2). Respondents argue that Petitioner falls into the plain language of the term "applicant for admission," which subjects him (and indeed, millions of other noncitizens in the same position as him) to detention without bond under § 1225(b)(2)'s supplemental detention framework to § 1226(a). Petitioner, in contrast, argues that he does *not* fall into § 1225(b)(2)'s plain language and scope, because he is not seeking admission before an immigration officer. Therefore, he asserts that his detention should fall under § 1226(a), which provides a detainee with a chance for bond. The Court agrees with Petitioner.

"The Court begins its review on the merits by examining the plain text of the relevant statutory provisions." *Duran-Rojas v. Raycraft*, No. 25-cv-14051, 2026 WL 243205, at *6 (E.D. Mich. Jan. 29, 2026). When interpreting statutory text, courts should "assign each word of the statute its ordinary, contemporary, common meaning… while keeping in mind that statutory language has meaning only in context." *Kentucky v. Biden*, 23 F.4th 585, 603 (6th Cir. 2022) (cleaned up and

citations omitted). Moreover, a statute "should be construed so that effect is given to all its provisions, so that no part will be inoperative or superfluous, void or insignificant[.]" *Corley v. United States*, 556 U.S. 303, 314 (2009).

Section 1225(b)(2)(A) states in its entirety that:

Subject to subparagraphs (B) and (C),[3] in the case of an alien who is an applicant for admission, if the examining immigration officer determines that an alien seeking admission is not clearly and beyond a doubt entitled to be admitted, the alien shall be detained for a proceeding under section 1229a of this title.

8 U.S.C. § 1225(b)(2)(A). As relevant here, an "applicant for admission" is statutorily defined as "[a]n alien present in the United States who has not been admitted or who arrives in the United States…" 8 U.S.C. § 1225(a)(1).

Respondents assert that Petitioner is an "applicant for admission" because he is present in the United States and, because he entered illegally, he has not been admitted. According to Respondents, "all unadmitted noncitizens present in the United States are 'applicants for admission,' regardless of their proximity to the border, the length of time they have been present in the United States, or whether they ever had the subjective intent to properly apply for admission." ECF No. 9, PageID.130.

Even if Petitioner falls into the definition of applicant for admission, however, Respondents' analysis ignores critical portions of § 1225(b)(2): "seeking admission"

---

[3] Subparagraphs (B) and (C) are not relevant here.

before an "examining immigration officer." The term "seeking," which is not statutorily defined, must be interpreted to have its ordinary meaning. And the term "seeking" "implies action—something that is currently occurring[.]" *Lopez-Campos*, 797 F. Supp. 3d at 781; *see also Lopez Benitez*, 795 F. Supp. 3d at 488 ("[T]he phrase 'seeking admission,' though undefined in § 1225(b)(2)(A), necessarily implies some sort of present-tense action." (quotation marks omitted)). "Admission" is statutorily defined as "the lawful *entry* of the alien into the United States after inspection and authorization by an immigration officer." 8 U.S.C. 1101(a)(13)(A) (emphasis added). While "entry" is not statutorily defined, it "has long been understood to mean 'a crossing into the territorial limits of the United States.'" *Briceno Solano v. Mason*, --- F. Supp. 3d ---, No. 2:26-cv-00045, 2026 WL 311624, at *12 (S.D. W. Va. Feb. 4, 2026) (quoting *Hing Sum v. Holder*, 602 F.3d 1092, 1100–01 (9th Cir. 2010)); *see also United States ex rel. Volpe v. Smith*, 289 U.S. 422, 425 (1933) (defining "entry" as the "coming of an alien from a foreign country into the United States.").

Taking everything together, Petitioner is not a noncitizen who is "seeking admission." Petitioner is not "presently asking for, or trying to presently gain, entry into the United States," as would be required if he were *seeking admission*—i.e., seeking a lawful *entry*. *Gu v. Noem*, No. 3:26-cv-00036, 2026 WL 621356, at *8 (N.D. Ohio Mar. 5, 2026). Rather, Petitioner has already been present in the interior

17

of the United States for years and was not "seeking" to enter the country at the time of his apprehension. This fact alone demonstrates that he does not fall within the plain parameters of § 1225(b)(2).

Respondents argue that "entry" is akin to the *legal* right to be in this country, and a noncitizen's prior "*physical* entry has no bearing on this analysis." ECF No. 9, PageID.131 (emphasis in original). Specifically, according to Respondents, an applicant for admission (a noncitizen that has not been lawfully admitted) who does not agree to immediately depart *must* be seeking a lawful entry, which Respondents equate to a legal means to remain in the country. *Id.* at PageID.132–33. Even if "entry" could be construed as ambiguous—i.e., possibly meaning "the legal right to be here" as Respondents claim, or possibly meaning "the act of entering the country," as Petitioner claims—the Court turns to the canon of statutory construction that "a statute ought, upon the whole, to be so construed that, if it can be prevented, no clause, sentence, or word shall be superfluous, void, or insignificant." *Alvarez Ortiz v. Freden*, 808 F. Supp. 3d 579, 591 (W.D.N.Y. 2025) (quoting *TRW Inc. v. Andrews*, 534 U.S. 19, 31 (2001)).

Respondents' preferred interpretation would result in "seeking admission" being superfluous because "if all 'applicant[s] for admission' are also 'seeking admission,' then the words 'seeking admission' would be surplusage." *Id.*

> After all, Congress simply could have said 'if the examining immigration officer determines that *an applicant for admission* is not

18

clearly and beyond a doubt entitled to be admitted, the alien shall be detained.' Instead, however, Congress said that an alien who is an applicant for admission *and who is seeking admission* shall be detained if the examining immigration officer determines that he or she is not clearly entitled to be admitted. 8 U.S.C. § 1225(b)(2)(A).

*Id.* "So 'seeking admission' cannot be synonymous with 'applicant for admission.' It must refer to seeking physical entry at the border, not the legal right to enter." *Id.* at 592. Petitioner's preferred interpretation allows both "applicant for admission" and "seeking admission" to do independent work. Under Petitioner's interpretation, a noncitizen falls under § 1225(b)(2) if he had never been admitted—i.e., never *lawfully* entered—*and* was presently at the border *seeking* to lawfully enter the country.

Furthermore, the temporal element that the term "seeking" adds to the statutory provision is solidified by the term "*examining* immigration officer." Section 1225(b)(2) only applies to noncitizens whom an *examining* immigration officer has determined are not clearly and beyond a doubt entitled to be admitted. *See* 8 U.S.C. § 1225(b)(2). The term "examining," also used in its present participle form like "seeking," similarly connotes "something that is currently occurring[.]" *Lopez-Campos*, 797 F. Supp. 3d at 781. In other words, § 1225(b)(2) "applies only where the alien is 'seeking admission' *at the same time* an 'examining immigration officer' determines that he is not clearly and beyond a doubt entitled to be admitted." *Hurtado-Medina v. Raycraft*, No. 25-cv-13248, 2025 WL 3268896, at *9 (E.D.

19

Mich. Nov. 24, 2025) (emphasis in original). Not only was Petitioner already *present* in the United States when he was detained, but there is no evidence that an immigration officer simultaneously examined him and determined "clearly and beyond a doubt" that Petitioner was inadmissible. *See Duran-Rojas*, 2026 WL 243205, at *7 ("[A]n examining immigration officer never determined that… petitioner was not clearly and beyond a doubt entitled to be admitted.").

As stated by the Southern District of New York, the Court's finding "accords with the plain, ordinary meaning of the words 'seeking' and 'admission.'" *Lopez Benitez*, 795 F. Supp. 3d at 489.

> For example, someone who enters a movie theater without purchasing a ticket and then proceeds to sit through the first few minutes of a film would not ordinarily then be described as "seeking admission" to the theater. Rather, that person would be described as already present there. Even if that person, after being detected, offered to pay for a ticket, one would not ordinarily describe them as "seeking admission" (or "seeking" "lawful entry") at that point—one would say that they had entered unlawfully but now seek a lawful means of remaining there. As § 1225(b)(2)(A) applies only to those noncitizens who are actively "seeking admission" to the United States, it cannot, according to its ordinary meaning, apply to Mr. Lopez Benitez, because he has already been residing in the United States for several years.

*Id.*

As is the case here. Petitioner has been residing in the United States for several years. He is not seeking a lawful entry before an examining immigration officer—he is seeking to *remain* instead. Congress could have drafted § 1225(b)(2)(A) without the qualifying term "seeking admission," but it chose not to. Respondents'

strained reading of the text violates the "basic canon of statutory interpretation that every word in [a] statute is presumed to have meaning and that courts should give effect to all the words to avoid an interpretation which would render words superfluous or redundant." *Blanco Cabrera*, 2026 WL 904606, at *10 (quoting *In re Village Apothecary, Inc.*, 45 F.4th 940, 948 (6th Cir. 2022)) (cleaned up).

Accordingly, the only conclusion is that Petitioner falls under § 1226(a),[4] which provides that "[o]n a warrant issued by the Attorney General, an alien may be arrested and detained pending a decision on whether the alien is to be removed from the United States," and that the Attorney General may either "continue to detain the arrested alien" or "may release the alien on" bond or conditional parole. 8 U.S.C. § 1226(a). Petitioner was arrested while in the United States, is charged by a warrant for having entered the country without authorization, and is detained pending a decision on his removal.

### iii.   Interpretation of the Text in Context of the INA

Looking beyond the plain text of § 1225(b)(2), the context in which this provision appears demonstrates that Respondents read the statute incorrectly. *See Roberts v. Sea-Land Servs., Inc.*, 566 U.S. 93, 101 (2012) ("It is a fundamental canon

---

[4] There is no argument that Petitioner falls under § 1225(b)(1), which only applies to particular noncitizens and provides for expedited removal proceedings, or § 1226(c)(1), which only applies to noncitizens with particular criminal histories.

of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme.'").

"The title of § 1225 is revealing: 'Inspection by immigrations officers; expedited removal of inadmissible arriving aliens; referral for hearing.'" *Velazquez v. Raycraft*, No. 25-cv-13675, 2026 WL 447417, at *4 (E.D. Mich. Feb. 17, 2026) (quoting 8 U.S.C. § 1225). The subheadings for § 1225(a), (b)(2), and (d) are, respectively, "Inspection," "Inspection of Other Aliens," and "Authority relating to inspections." 8 U.S.C. § 1225. "'Inspection' denotes… 'a checking or testing of an individual against established standards'… and to 'inspect' means 'to view closely in critical appraisal: look over' or 'to examine officially.'" *Singh v. Noem*, No. CIV 25-1110 JB/KK, 2026 WL 146005, at *13 (D.N.M. Jan. 20, 2026) (quoting Merriam-Webster.com Dictionary). The word "inspection" is "difficult to reconcile with mass or abstract enforcement" in the interior of the country, particularly when words like "arrest" and "apprehension" appear nowhere in the statutory provision. *Id.*

Furthermore, the section explicitly addresses arriving aliens, stowaways, and crewmen, "words that suggest arrival at a border or port of entry." *Pizarro Reyes v. Raycraft*, No. 25-cv-12546, 2025 WL 2609425, at *5 (E.D. Mich. Sept. 9, 2025). And it prescribes detailed procedures for inspection and screening of aliens by immigration officers at the border. *See* § 1225(a), (b)(1), (d). The INA's implementing regulations "likewise tie such inspections to the border." *Espinal v.*

22

*Ybarra*, No. 26-76 JB/GJF, 2026 WL 851254, at *12 (D.N.M. Mar. 27, 2026) (citing 8 C.F.R. § 235.1(a) ("Application to lawfully enter the United States shall be made in person to an immigration officer at a U.S. port-of-entry when the port is open for inspection…")). "By anchoring § 1225 in inspection concepts that Congress defines, it signals that an inspection at the threshold of entry triggers the powers and procedures [in § 1225]." *Singh*, 2026 WL 146005, at *14.

"By contrast, § 1226 speaks in remarkably different terms." *Id.* at *22. That section is titled "Apprehension and detention of aliens." 8 U.S.C. § 1226. It "employs language associated with warrants… work authorization… and prior convictions[.]" *Singh*, 2026 WL 146005, at *22. (citing 8 U.S.C. § 1226(a), (a)(3), and (c)(1)(E)). The "post-entry language of § 1226 reflects Congress' considered judgment that different procedures are appropriate for preventing entry than for removing individuals who have already entered and established presence." *Id.* Indeed, this is "[t]he line historically drawn between [§ 1225 and § 1226]." *Martinez v. Hyde*, 792 F. Supp. 3d 211, 221 (D. Mass. 2025).

Respondents argue instead that the structure of § 1225 supports their interpretation. According to Respondents, § 1225(b) differentiates between "arriving aliens" in (b)(1)—who are arriving at a port of entry and subject to expedited removal proceedings—and applicants for admission, who are subject to full removal proceedings in (b)(2). ECF No. 9, PageID.135–36. Respondents claim that if

23

Petitioner's interpretation is followed, it would "eviscerate" any distinction between (b)(1)'s "arriving aliens" and (b)(2)'s "applicants for admission"; in other words, if noncitizens like Petitioner do not fall under (b)(2)'s purview, (b)(2) would have no purpose. *Id.* at PageID.137–38, 140.

Not so. Respondents ignore § 1225's "inspection-centered posture," which makes clear that Congress intended to tie "the concept of 'applicant for admission' to inspection rather than to a freestanding status untethered from the inspection context." *Singh*, 2026 WL 146005, at *20. An immigration officer inspecting a noncitizen "triggers both § 1225(b)'s removal pathways… and the pathways operate as alternative outcomes *of the inspection process*." *Id.* (emphasis added). Section 1225(b)(1) painstakingly divides applicants for admission into subgroups and specifies those who are subject to expedited removal and how these individuals may seek asylum. *Id.* at *18; *see* 8 U.S.C. § 1225(b)(1). Then, § 1225(b)(2) "comes over the horizon" and serves as a "catchall provision" for those individuals seeking entry at the border who are "not covered by § 1225(b)(1)." *Id.* (quoting *Jennings*, 583 U.S. at 287). Individuals who may fall into this catch-all provision include lawful permanent residents returning from abroad who potentially abandoned their lawful permanent resident status by staying abroad too long; individuals entering under the visa waiver program; and U.S. citizens who cannot present proper documentation. *See Zumba v. Bondi*, No. 25-cv-14626 (KSH), 2025 WL 2753496, at *7 (D.N.J. Sept.

26, 2025). Thus, the most logical reading of § 1225(b) is that it governs different categories of persons presenting themselves for *inspection and entry* and prescribes different procedures for those noncitizens.

Moreover, Respondents' reading of the statute renders much of § 1226(c)(1) redundant. *See In re Arnett*, 731 F.2d 358, 361 (6th Cir. 1984) ("[A] construction of one part or provision of a statute which renders another part redundant or superfluous should be rejected; all parts of a statute should, if possible, be given effect."). In 2025, Congress passed the Laken Riley Act, which amended § 1226 to add subparagraph (c)(1)(E). Subparagraph (c)(1)(E) makes a noncitizen subject to mandatory detention if "he (i) is inadmissible under 8 U.S.C. § 1182(a)(6)(A), (6)(C), or (7) (the 'inadmissibility criterion'); *and* (ii) is charged with, arrested for, convicted of, or admits to committing certain crimes (the 'criminal conduct criterion')." *Gomes*, 804 F. Supp. 3d at 275. In other words, to be subject to mandatory detention under (c)(1)(E), a noncitizen must meet the inadmissibility criterion *and* the criminal conduct criterion.

"Interpreting Section 1225(b)(2) to apply to noncitizens who are arrested on a warrant while residing in the United States… would render Section 1226(c)(1)(E)'s criminal conduct criterion superfluous for noncitizens who are inadmissible on two of the three grounds specified in the inadmissibility criterion." *Id*. To explain, 8 U.S.C. § 1182(a)(6)(A) states that a noncitizen is inadmissible if he is "present in the

25

United States without being admitted or paroled, or who arrives in the United States at any time or place other than as designated by the Attorney General." And 8 U.S.C. § 1182(a)(7) states that a noncitizen is inadmissible if he is not in possession of a valid entry document. For noncitizens falling into these categories of inadmissibility, in order to be subject to mandatory detention under § 1226(c)(1)(E), they *also* need to have the requisite criminal history prescribed in that subparagraph. But under Respondents' reading of the statute, these noncitizens are *already* subject to mandatory detention under § 1225(b)(2) regardless of their criminal histories. In other words, Respondents' interpretation renders much of Congress's *very recent* addition to § 1226(c)(1) "pointless." *Lopez-Campos*, 797 F. Supp. 3d at 784. This Court "will not find that Congress passed the Laken Riley Act to 'perform the same work' that was already covered by § 1225(b)(2)." *Id.*

*iv.*      <u>*Legislative History and Prior Agency Enforcement*</u>

The legislative history of § 1226(a) further supports Petitioner. Before the Illegal Immigration Reform and Immigration Responsibility Act ("IIRIRA") passed, which enacted § 1226(a) and § 1225(b) as we know it today,

> …the predecessor statute to Section 1226(a) governed deportation proceedings for all noncitizens arrested within the United States. *See* 8 U.S.C. § 1252(a)(1) (1994) ("Pending a determination of deportability ... any [noncitizen] ... may, upon warrant of the Attorney General, be arrested and taken into custody."); *Hose v. I.N.S.*, 180 F.3d 992, 994 (9th Cir. 1999) ("A deportation hearing was the 'usual means of proceeding against a[ ] [noncitizen] already physically in the United States[.]' ").

26

> This predecessor statute, like Section 1226(a), included discretionary release on bond. *See* § 1252(a)(1) (1994) ("[A]ny such [noncitizen] taken into custody may, in the discretion of the Attorney General ... be continued in custody ... [or] be released under bond[.]"). Upon passing IIRIRA, Congress declared that the new Section 1226(a) "restates the current provisions in [the predecessor statute] regarding the authority of the Attorney General to arrest, detain, and release on bond a[ ] [noncitizen] who is not lawfully in the United States." H.R. Rep. No. 104-469, pt. 1, at 229; *see also* H.R. Rep. No. 104-828, at 210 (same).

*Pizarro Reyes*, 2025 WL 2609425, at *7 (quoting *Rodriguez*, 779 F. Supp. 3d at 1260).

Respondents argue, in contrast, that the history of the IIRIRA actually supports their interpretation of the statute because the purpose of the IIRIRA was to eliminate an "anomaly" whereby immigrants who attempted to enter lawfully were in a worse position than those who entered unlawfully. ECF No. 9, PageID.142. But this "historical analysis is overbroad." *Martinez Hernandez v. Raycraft*, No. 3:25-CV-02591-DAR, 2026 WL 698639, at *12 (N.D. Ohio Mar. 12, 2026). It treats "*one of Congress'[s] concerns in enacting IIRIRA… as Congress's sole concern driving the statute*." *Salcedo Aceros v. Kaiser*, No. 25-cv-06924-EMC (EMC), 2025 WL 2637503, at *11 (N.D. Cal. Sept. 12, 2025) (emphasis in original). Congress *did* address this concern in other ways, such as providing consolidated exclusion and deportation procedures, imposing a greater burden of proof on unlawful immigrants in removal proceedings, and requiring tougher standards for discretionary immigration benefits. *Id.* (citing H.R. Rep. 104-469, 12). But Congress "did not fully

disrupt the old system, including the system of detention and release," as made clear by the legislative history demonstrating otherwise. *Id.* at *12.

> Congress' concern about adjusting the law in some respects to reduce inequities in the removal process did not mean Congress intended to entirely up-end the existing *detention* regime by subjecting *all* inadmissible noncitizens to mandatory detention, a seismic shift in the established policy and practice of allowing discretionary release under Section 1226(a)—the scope of which Congress did not alter.

*Id.* (emphasis added).

Indeed, this distinction between § 1225 and § 1226 is a distinction that *Respondents themselves* have historically made. Respondents' prior practice of detaining noncitizens already present in the country under § 1226(a) had been "unbroken for almost thirty years, not to mention the much longer historical practice from which it stems[.]" *Buenrostro-Mendez v. Bondi*, 166 F.4th 494, 514 (5th Cir. 2026) (Douglas, J., dissenting); *see, e.g.*, Dep't of Justice, *Detention and Removal of Aliens*, 62 Fed. Reg. 10,312, 10,323 (Mar 6, 1997) ("Despite being applicants for admission, aliens who are present without having been admitted or paroled… will be eligible for bond and bond redetermination."). And for thirty years, Congress has not objected to or corrected DHS's failure to detain "the millions of people it purportedly required to be detained." *Id.* at 515; *see Zemel v. Rusk*, 381 U.S. 1, 11 (1965) ("Congress' failure to repeal or revise in the face of such administrative interpretation… constitute[s] persuasive evidence that that interpretation is the one [Congress] intended.").

28

"Given this history, the Court properly treats Respondents' assertion of a previously unheralded power to detain non-citizens present in the United States under section 1225(b)(2)(A) with a measure of skepticism." *Martinez*, 792 F. Supp. 3d at 222 (quoting *West Virginia v. Env't Prot. Agency*, 597 U.S. 697, 748 (2022) (Gorsuch, J., concurring)) (cleaned up).

> No one has ever thought that § 1225(b)(2)(A) means what [Respondents] say it means—because it does not mean it. Congress did not secretly require two million noncitizens to be detained without bond, when nothing like this had ever been done before, and the whole history of American immigration law suggested it would not be. We would "expect more than simple statutory silence if, and when, Congress were to intend a major departure." *Czyzewski v. Jevic Holding Corp.*, 580 U.S. 451, 465, 137 S.Ct. 973, 197 L.Ed.2d 398 (2017). This is to say nothing of this hidden power's enormous "economic and political significance," which is another "reason to hesitate before concluding that Congress meant to confer such authority." *West Virginia*, 597 U.S. at 721, 142 S.Ct. 2587 (quoting *Brown & Williamson*, 529 U.S. at 159, 120 S.Ct. 1291). Amici American Immigration Council and American Immigration Lawyers Association describe the obviously enormous impact of requiring the detention without bond of potentially millions of noncitizens long present in the United States, including noncitizens with citizen spouses, children, and grandchildren, and noncitizens otherwise specially protected by other statutory schemes due to their youth, status as survivors of crime, abuse, or trafficking, or other hardships. This is a quintessential elephant-in-a-mousehole interpretation, and is all the more suspect because of the inconsistency of the agency's views and its longstanding failure to assert this hidden power.

*Buenrostro-Mendez*, 166 F.4th at 516–17 (Douglas, J., dissenting).

For all of the foregoing reasons, Petitioner is likely to succeed on his claim that his detention without bond violates the INA, because his detention should be pursuant to § 1226(a)—which requires a bond hearing—and not § 1225(b)(2).

### b. Due Process

The Due Process Clause of the Fifth Amendment forbids the Government from depriving any person of life, liberty, or property without due process of law. U.S. Const. amend V. "Freedom from imprisonment—from government custody, detention, or other forms of physical restraint—lies at the heart of the liberty that Clause protects." *Zadvydas v. Davis*, 533 U.S. 678, 690 (2001). "It is well established that the Fifth Amendment entitles aliens to due process of law in the context of removal proceedings." *Trump v. J.G.G.*, 604 U.S. 670, 673 (2025) (quoting *Reno v. Flores*, 507 U.S. 292, 306 (1993)). Indeed, "the Due Process Clause applies to all 'persons' within the United States, including aliens, whether their presence here is lawful, unlawful, temporary, or permanent." *Zadvydas*, 533 U.S. at 693. "So, detainees are entitled to notice and opportunity to be heard 'appropriate to the nature of the case.'" *J.G.G.*, 604 U.S. at 673 (quoting *Mullane v. Cent. Hanover Bank & Tr. Co.*, 339 U.S. 306, 313 (1950)).

To establish a violation of the Due Process Clause, a court must consider the three factors the Supreme Court set out in *Mathews v. Eldridge*: (1) the private interest affected, (2) the risk of erroneous deprivation of that private interest and the

30

value of any additional safeguards, and (3) the government's interest, including the fiscal and administrative burden the additional safeguards would impose. 424 U.S. 319, 334–35 (1976)).

Petitioner argues that his detention violates the Due Process Clause of the Fifth Amendment. Petitioner notes that he has been living in the country for years and that the Government engaged in no assessment of risk regarding dangerousness or flight before it arbitrarily detained him. ECF No. 1, PageID.16–17. Respondents, in contrast, argue that the due process rights afforded to noncitizens are coextensive with the rights provided by Congress in immigration statutes. ECF No. 9, PageID.145–46. According to Respondents, Petitioner is subject to § 1225(b)(2), and due process does not entitle him to a bond hearing. *Id.* at PageID.146.

But as the Court already explained, Petitioner's detention under § 1225(b)(2) is likely unlawful, and "therefore the process due to him is that which is afforded under Section § 1226(a)." *Lopez-Campos*, 797 F. Supp. 3d at 785. Given that the Court has found that Petitioner is subject to § 1226(a), *not* § 1225(b)(2), "Respondents' argument as to the due process required by § 1225(b)(2) is futile." *Quintero v. Olson*, No. 4:26-cv-34-DJH, 2026 WL 596643, at *3 (W.D. Ky. Mar. 3, 2026). The Court proceeds to examine the *Mathews v. Eldridge* factors.

The first *Mathews* factor weighs strongly in favor of Petitioner. "Petitioner has a significant private interest in avoiding detention, one of the 'most elemental of

liberty interests.'" *Sanchez Alvarez v. Noem*, 807 F. Supp. 3d 777, 789 (W.D. Mich. 2025) (quoting *Hamdi v. Rumsfeld*, 542 U.S. 507, 529 (2004)). Indeed, "[f]reedom from imprisonment—from government custody, detention, or other forms of physical restraint—lies at the heart of the liberty that [the Due Process] Clause protects." *Zadvydas*, 533 U.S. at 690.

The second *Mathews* factor also supports Petitioner. Removal proceedings "are civil, not criminal, and we assume that they are nonpunitive in purpose and effect." *Zadvydas*, 533 U.S. at 690. The Government "has generally identified two regulatory goals justifying civil immigration detention: 'ensuring the appearance of aliens at future immigration proceedings' and 'preventing danger to the community.'" *Gomez v. Bondi*, No. SA-26-CA-00727-XR, 2026 WL 753307, at *10 (W.D. Tex. Mar. 13, 2026) (citing *Zadvydas*, 533 U.S. at 690). Civil detention is impermissibly "punitive if it becomes a mechanism for retribution or general deterrence." *Id*. (quoting *Kansas v. Crane*, 534 U.S. 407, 412 (2002)). Under the circumstances here, where Petitioner is likely impermissibly detained under § 1225(b)(2) and has not received the bond hearing he would normally be entitled to under § 1226(a), the risk of the erroneous deprivation of Petitioner's liberty (when he may not be a flight risk or danger to society) is intolerably high. And because Petitioner has no other redress to his detention, "*any* additional safeguard against

unreasonable detention will be valuable." *Al-Thuraya v. Warden, Orange Cnty. Corr. Facility*, 809 F. Supp. 3d 135, 145 (S.D.N.Y. 2025) (emphasis in original).

The third *Mathews* factor also favors Petitioner. The Government's interest in detaining Petitioner without bond pending removal is low. While the Government undoubtedly has a weighty interest in ensuring the removal of noncitizens who are here unlawfully, this interest is "in fact protected by the individualized determination by an IJ as to whether an individual should be granted bond at all under existing, well-established procedures" to determine whether he is a risk of flight or danger to society. *Rodriguez Cabrera v. Mattos*, 808 F. Supp. 3d 1159, 1182 (D. Nev. 2025). Moreover, "[i]n immigration court, custody hearings are routine and impose a 'minimal' cost." *Omer G.G. v. Kaiser*, 815 F. Supp. 3d 1098, 1111 (E.D. Cal. 2025).

Given that all *Mathews* factors favor Petitioner, Petitioner is likely to succeed on the merits of his due process claim.

### C. Irreparable Harm

The second preliminary injunction factor is whether Petitioner will suffer irreparable harm in the absence of an injunction. Petitioner argues that detention without a bond hearing is a deprivation of physical liberty that constitutes an irreparable harm. ECF No. 2, PageID.87. He notes that detention has deprived him of freedom of movement and has separated him from his family and community, and has caused him emotional and physical distress. *Id.* at PageID.87–88. The

Government, in contrast, argues that detention during removal proceedings does not constitute an irreparable injury, as § 1225(b)(1), (b)(2), and § 1226(c)(1) are all mandatory detention statutes, and detention under § 1226(a) is allowed where the noncitizen is a flight risk or danger to the community. ECF No. 11, PageID.191.

The Court concludes that this factor clearly favors Petitioner. "Obviously, the [unlawful deprivation] of liberty is a… severe form of irreparable injury." *J.A.C.P.*, 2025 WL 3013328, at *7 (quoting *Ferrara v. United States*, 370 F. Supp. 2d 351, 360 (D. Mass. 2005)). And "[c]ourts have… held that a plaintiff can demonstrate that a denial of an injunction will cause irreparable harm if the claim is based upon a violation of plaintiff's constitutional rights." *Say v. Adams*, No. 3:07-CV-377-R, 2008 WL 718163, at *3 (W.D. Ky. Mar. 14, 2008) (quoting *Overstreet v. Lexington-Fayette Urban Cnty. Gov't*, 305 F.3d 566, 578 (6th Cir. 2002)); *see also Chavarriaga Rojas v. Albarran*, --- F. Supp. 3d ---, 2025 WL 4693108, at *10 (N.D. Cal. Dec. 22, 2025) ("The likely unconstitutional deprivation of liberty that petitioners face is an immediate and irreparable harm, even if it were to last only until a post-detention bond hearing."). The Court explained at length that Petitioner's detention without an opportunity for bond is unlawful and unconstitutional. Moreover, Petitioner has no criminal history and has complied with all immigration requirements, so there is little reason to believe bond would be denied if he were properly afforded such an

opportunity. Any further detention without the possibility for bond is an irreparable harm.

Respondents' argument in opposition misses the mark. Although statutes exist to require mandatory detention during removal proceedings, Petitioner falls under § 1226(a), which provides for a bond hearing. *See Lepe v. Andrews*, 801 F. Supp. 3d 1104, 1119 (E.D. Cal. 2025) ("The flaw in this argument is that the government is attempting to enforce the immigration laws based on a misreading of the statutes[.]"). Moreover, Respondents quote *Overstreet* out of context for the proposition that Petitioner's claim—that he "is entitled to a presumption of irreparable harm based on the alleged constitutional violation"—is "without merit." *Overstreet*, 305 F.3d at 578. In context, the *Overstreet* court stated that the plaintiff's "irreparable harm" argument based on a constitutional violation was without merit because it was "unlikely that Mr. Overstreet [would] be able to demonstrate that he has a cognizable constitutional claim." *Id.* Not so here: Petitioner has a likelihood of success on his due process claim.

At the hearing, Respondents further argued that Petitioner does not face irreparable harm because it is "unlikely" that ICE will apprehend him again. Respondents stated that ICE only encountered Petitioner by chance when he was first apprehended, and Petitioner has no criminal history that would make him a special target for enforcement. But unless Respondents concede that detention under

35

§ 1225(b)(2) is unlawful, Petitioner faces the possibility of arrest throughout the remainder of his removal process. *See Valencia Zapata*, 801 F. Supp. 3d at 940 (in granting a preliminary injunction after ordering the petitioners' release by TRO, finding that there was a likelihood of irreparable harm because the government's position was that § 1225(b)(2) was still applicable to the petitioners and it could re-detain them at any time). Petitioner's continued interaction with Respondents during removal proceedings subjects him to a risk of re-detention throughout this process. *See, e.g.*, *Gomes*, 804 F. Supp. 3d at 268 (noting that ICE arrested the petitioner at a hearing before the Immigration Court).

Thus, Petitioner faces irreparable harm in the absence of an injunction.

### D. Balance of Equities and Public Interest

The third and fourth preliminary injunction factors—which merge when the Government is an opposing party—are the balance of the equities and the public interest. Petitioner argues that the harm caused by his deprivation of liberty is great, and that Respondents face little if any harm if they are required to give him a bond hearing. He also argues that the public has a strong interest in ensuring that immigration detention is conducted lawfully. ECF No. 2, PageID.89–90. The Government argues that Petitioner cannot establish these prongs simply by being denied immigration rights. The Government further argues that because Petitioner

36

entered unlawfully and is in removal proceedings, the equities and public interest do not favor a bond hearing or release. ECF No. 11, PageID.195.

Petitioner has the better argument. "[I]t is always in the public interest to prevent the violation of a party's constitutional rights." *Say*, 2008 WL 718163, at *4. It is also in the public interest that the Government apply its laws correctly. *See A.P. by Pursley v. Bd. of Educ. for Tullahoma City Schs.*, No. 4:14-cv-65, 2014 WL 12705166, at *5 (E.D. Tenn. Oct. 10, 2014) (finding it in the public interest to uphold procedural protections found in a statute). The Government faces minimal costs in simply performing a bond hearing, as required under § 1226(a), before detaining Petitioner again. *Omer G.G.*, 815 F. Supp. 3d at 1111; *see also Alejandro*, 2025 WL 2896348, at *9 ("A preliminary injunction in [Petitioner's] favor… would merely prevent Respondents from applying Section 1225(b) to [Petitioner] based on the specific facts presented here."). "[F]aced with a choice between these minimally costly procedures and preventable human suffering… the Court concludes that the balance of hardships tips decidedly in [P]etitioner's favor." *Lepe*, 801 F. Supp. 3d at 1119 (citation omitted) (cleaned up).

Therefore, the balance of equities and public interest factors favor Petitioner.

### E. Remedy

"[I]njunctive relief should be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs." *Madsen v. Women's Health*

*Ctr.*, 512 U.S. 753, 765 (1994). As the Court has found a strong likelihood of success on the merits that Petitioner should be detained under § 1226(a) and not § 1225(b), Petitioner is subject to a bond hearing upon any future re-detention, which is the minimum and least burdensome remedy necessary to provide Petitioner complete relief. Thus, upon re-detention, Petitioner is entitled to a bond hearing pursuant to 8 U.S.C. § 1226(a) at which a neutral arbiter must determine whether there is any valid basis for Petitioner's detention pending the conclusion of his removal proceedings.

### F. Jurisdiction

For the first time at the preliminary injunction hearing, the parties informed the Court that Petitioner returned to his home in Florida after the Court ordered his release. According to Respondents, this action divested the Court of jurisdiction in the habeas matter. According to Petitioner, however, the Court maintains jurisdiction.

The Court finds that the issue of whether the Court maintains jurisdiction must be briefed by the parties. The Court directs the parties to address the following authorities: *Rumsfeld v. Padilla*, 542 U.S. 426 (2004); *Carafas v. Lavellee*, 391 U.S. 234, 238 (1968); *Sanders v. Freeman*, 221 F.3d 846, 851 (6th Cir. 2000) ("Because Sanders was in custody… when he filed his petition for habeas corpus… this court has jurisdiction over this case even though Sanders was not in custody at the time he filed his appeal."); *DePompei v. Ohio Adult Parole Auth.*, 999 F.2d 138, 140 (6th Cir.

1993) ("DePompei's unconditional release from custody after the petition had been filed did not disturb the court's jurisdiction."); *Klemp v. Renico*, No. 04CV71862DT, 2005 WL 1027995, at *1 (E.D. Mich. Apr. 19, 2005) ("Jurisdiction is determined at the time the petition is filed.").

## IV.   CONCLUSION

For the foregoing reasons,

1.  Respondents' Motion to Dissolve TRO [ECF No. 10] is GRANTED.

2.  The Court construes Petitioner's Motion for TRO [ECF No. 2] as a Motion for Preliminary Injunction.

3.  Petitioner's Motion for Preliminary Injunction [ECF No. 2] is GRANTED as set forth below.

4.  Respondents are ENJOINED and RESTRAINED from re-detaining Petitioner under 8 U.S.C. § 1225(b)(2).

5.  Respondents are further REQUIRED to provide Petitioner <u>a bond hearing before a neutral immigration judge **under 8 U.S.C. § 1226(a)**</u> upon Petitioner's re-detention (if any), at which the judge must determine whether there is any valid basis for Petitioner's detention pending the conclusion of his removal proceedings.

6. The requirement of security under Rule 65(c) of the Federal Rules of Civil Procedure is WAIVED because of the strength of Petitioner's case, because the preliminary injunction will require Respondents to sustain little or no cost or damage, and because the suit is brought in the public interest. *See Moltan Co. v. Eagle-Picher Indus., Inc.*, 55 F.3d 1171, 1176 (6th Cir. 1995)); *Bruner v. Zawacki*, No. 3:12-57-DCR, 2013 WL 2903241, at *5 (E.D. Ky. June 13, 2013).

7. The parties are ORDERED to file supplemental briefs on whether the Court retains jurisdiction in this case by **May 13, 2026.** The supplemental briefs shall be limited to **10 pages each.**

   **IT IS SO ORDERED.**

Dated:  May 6, 2026

/s/Gershwin A. Drain
GERSHWIN A. DRAIN
United States District Judge

40